AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Marcelo Marquise Jeter, | ) | Case No.  21-8001-BER |
| David Andrew Romario Chin, and Ryan Tyler Khan | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

FILED BY _____ **TM** _____ D.C.

**Jan 4, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 2019 - July 2020 _____ in the county of _____ Palm Beach _____ in the
_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) & 846 | Conspiracy to possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, and 50 grams or more of methamphetamine. |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

/s/
_____
Complainant's signature

David Weeks, Special Agent DEA
_____
Printed name and title

Sworn and Attested to me by Applicant by Telephone (~~Facetime~~) pursuant to Fed. R. Crim. P. 4(d) and 4.1

Date: 1/4/21
_____

_____
Judge's signature

City and state: _____ West Palm Beach, FL _____

Bruce Reinhart, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT

I, David Weeks, first being duly sworn, do hereby depose and state as follows:

1.     I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Miami, Florida Field Division, West Palm Beach District Office, and have been so employed since February 2010.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).  I have received training on the subject of narcotics trafficking, and money laundering from the DEA, and have been personally involved in investigations concerning the possession, manufacture, distribution, transportation and importation of controlled substances, as well as methods used to finance drug transactions, and launder drug proceeds.

2.     Prior to my assignment with the DEA, I was a police officer for the City of West Palm Beach Police Department (WPBPD), and had been so employed since April 1997.  During my last nine years with the WPBPD, I was assigned to the Special Investigations Division, and from there assigned to a money laundering task force and to the DEA task force. During that time, I was tasked with the responsibility of investigating money laundering and narcotics related crimes. As a law enforcement officer, I have been involved in over 100 narcotics-related arrests and participated in the execution of over 50 narcotics-related search warrants.

3.     This affidavit is submitted in support of a criminal complaint charging Marcello Marquise JETER, David Andrew Romario CHIN, and Ryan Tyler KHAN with: conspiracy to possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, and 50 grams or more of methamphetamine, in violation of Title

21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846. The information contained in this affidavit is based on my own personal knowledge, as well as information imparted to me from other law enforcement officers and agents. This affidavit is submitted for the limited purpose of establishing probable cause. It does not purport to describe everything known to me concerning the investigation.

### Background

4.      In or around August 2019, agents from the DEA initiated an investigation into a Drug Trafficking Organization operating in and around Palm Beach County, Florida. Intelligence obtained from a DEA Confidential Source (CS) identified Marcello JETER as the leader of the organization. For ease of reference, the CS will be referred to herein in the masculine gender even though this may not be reflective of the CS's true gender.

5.      The CS advised that he had known Marcello Marquise JETER, a.k.a. "C" and "Cello" (hereinafter "JETER") for approximately nine months and had purchased heroin and methamphetamine from JETER during this time. The CS indicated that JETER and JETER's organization distributed multi-ounce quantities of methamphetamine and a second substance, which the CS believed to contain a mixture of heroin and/or fentanyl, in and around Palm Beach County, Florida. According to the CS, JETER sold an ounce of methamphetamine for $600 and heroin/fentanyl capsules for $20 each. The CS said that JETER drove a white Mercedes Benz, a dark colored Dodge Charger, and various rental vehicles.  The CS further said that JETER utilized at least two cellular telephones to conduct his drug trafficking activities and that JETER normally kept the drugs in a shoulder bag while he was distributing them. The CS stated that he had contacted JETER to arrange the purchase of controlled substances using telephone numbers (561) 359-XXXX and (561) 603-XXXX. Finally, the CS advised that in the past, when JETER was out

2

of town, or unavailable, JETER directed the CS to contact a black male whom the CS believed to be JETER's best friend and partner in his drug trafficking activities. The CS described this male as 25 to 26 years old, having short twisted hair, and using reading glasses. The CS stated JETER's partner utilized telephone number (561) 507-XXXX. During the course of the investigation, the CS positively identified this male and the user of telephone number (561) 507-XXXX as David Andrew Romario CHIN (CHIN).

6.      In response to the information obtained from the CS and through additional investigative means, agents from the DEA began a series of undercover operations to make controlled purchases of methamphetamine and heroin/fentanyl from members of this organization. Notably, during the course of this investigation, JETER was incarcerated in the Palm Beach County Jail from August 20, 2019 until September 13, 2019 for charges unrelated to the DEA's investigation.

### August 29, 2019 UC/CS Purchase of Narcotics from David CHIN

7.      On or about August 22, 2019, the CS received a text message from telephone number (561) 507-XXXX, which was known by the CS to be used by CHIN to distribute heroin/fentanyl and methamphetamine on behalf of or in association with JETER.     The text message read, "This C people I'll take care of u if u need." (As previously noted, JETER, a.k.a. "C," was in the Palm Beach County Jail at the time of this text.)

8.      On August 29, 2019 at approximately 11:13 a.m., the CS placed a recorded telephone call to telephone number (561) 507-XXXX, utilized by CHIN. During this telephone call, the CS asked CHIN if he (CHIN) was going to be around.  CHIN affirmed but stated that he was at the DMV. The CS told CHIN that he (the CS) needed an hour any way, and he was on his way down.  CHIN affirmed and the call ended.

9.     On August 29, 2019 at approximately 12:05 p.m., the CS and CHIN, who utilized telephone number (561) 507-XXXX, exchanged a series of text messages. During that exchange, CHIN directed the CS to meet him (CHIN) at XXXX Sand Dunes Circle, West Palm Beach, Florida in 30 to 45 minutes.

10.    On August 29, 2019 at approximately 1:30 p.m., the CS placed a recorded telephone call to telephone number (561) 507-XXXX, utilized by CHIN. During this telephone call, the CS informed CHIN that he (the CS) was about 15 minutes away and asked CHIN if CHIN had an "onion," to which CHIN affirmed. The CS clarified that he (the CS) was referring to the "Tina," which is coded language used to describe methamphetamine. Once again, CHIN affirmed. The CS stated that he (the CS) also had "200 for caps," meaning which meant $200 to purchase capsules of heroin/fentanyl.  CHIN affirmed. The CS again noted that he would be there in about 15 minutes and the call ended. Prior to sending the CS to meet with CHIN, agents searched the CS's person for any contraband to include drugs and/or money. That search was negative.

11.    On August 29, 2019 at approximately 1:47 p.m., two undercover agents (UCs) and the CS arrived at XXXX Sand Dune Circle, West Palm Beach, FL. Upon their arrival, the CS and one of the UCs exited the unmarked vehicle and made contact with CHIN, who was waiting for them in a silver Toyota Prius bearing a New York license tag, parked in front of the building. According to New York vehicle registration records, the Toyota is registered to a relative of Ryan KHAN.

12.    The CS and UC entered CHIN's vehicle.  Once inside the vehicle, the CS sat in the front passenger seat while the UC sat in the rear passenger seat. The UC observed CHIN with several capsules spread out on a clear sheet of saranwrap on his (CHIN's) lap. The CS gave CHIN

4

$200 of DEA Official Advanced Funds (OAF) and received 12 capsules of suspected heroin/fentanyl in return. CHIN then wrapped up the remaining capsules in the saranwrap and placed them in the larger pocket within the top of a fanny pack. The UC then handed CHIN $600 of DEA OAF and received approximately one ounce of suspected methamphetamine. The UC observed CHIN remove the ounce of methamphetamine from the fanny pack that CHIN had on his person (wrapped on his chest). During the exchange, the CS asked CHIN if it was okay for the UC to have his (CHIN's) telephone number. CHIN agreed. Once the transaction was completed, the UC and CS returned to the unmarked vehicle and left the area. Following the undercover purchase, the CS relinquished custody of the suspected heroin/fentanyl to agents. At this time, agents searched the CS's person for any additional contraband to include drugs and/or money. That search was negative. Audio and video of the controlled purchase was captured and placed into evidence.

13.     Following the transaction, the substances purchased from CHIN were submitted to the DEA Southeast Laboratory for forensic analysis. The lab confirmed that the 12 capsules contained a mixture and substance containing fentanyl and heroin, and had a net weight of 1.217 grams. The lab also confirmed that the ounce of suspected methamphetamine was, in fact, methamphetamine hydrochloride, a Schedule II controlled substance, which had a purity of approximately 93% and a net weight of 27.74 grams. Thus, the amount of methamphetamine contained in this exhibit was 25.79 grams.

**September 19, 2019 CS Purchase of Narcotics from Marcello JETER**

14.     On or about September 16, 2019, three days after JETER was released from the Palm Beach County Jail, the CS received an incoming telephone call from telephone number (561) 774-XXXX. The CS did not recognize the telephone number and the call was not recorded.

JETER identified himself to the CS and advised that this was his (JETER's) new telephone number.

15.     On September 19, 2019, agents met with the CS to conduct an undercover purchase of heroin/fentanyl and methamphetamine from JETER. Prior to the execution of the operation, agents conducted a search of the CS's person for any contraband to include drugs and/or money. That search was negative. The CS was initially provided $200 of DEA OAF to purchase $200 of heroin. As detailed below, agents later gave the CS an additional $600 of DEA OAF to purchase an ounce of methamphetamine.  On this same date at approximately 1:19 p.m., the CS placed a recorded telephone call to telephone number (561) 774-XXXX, utilized by JETER. During this telephone call, the CS asked JETER if he (CS) could meet with him. JETER agreed and directed the CS to go to the area of Southern Boulevard and I-95. The CS affirmed and told JETER he (the CS) would call when he was close to Southern Boulevard.

16.     During a subsequent recorded telephone call, the following dialogue was exchanged between the CS and JETER, who utilized telephone number (561) 774-XXXX. The CS informed JETER that the CS was at "Okee and 95," and asked JETER where to go. JETER told the CS to get off on Southern, and that he (JETER) would be there in about 15 minutes. The CS acknowledged. JETER then asked the CS, "You want me to bring the T too?" The CS responded, "Yeah, I need an onion." JETER responded, "Oh, you need an onion?" The CS affirmed. JETER asked, "You need it right now?" The CS responded, "Yeah, if you can." JETER replied, "Ok, shit you know I can if you got the cash!" The CS responded, "Hell yeah, I got it. Six ($600), right?" JETER affirmed. The CS told JETER, "Alright I got it. Alright, yeah and I got 200 ($200) for hats, so." JETER responded, "Alright I'm on my way right now, meet me, um, get off Southern and go, go, go east to the Boost Mobile right there." The CS asked, "Alright, the Boost

6

Mobile?" JETER affirmed and the call ended. It should be noted that, based on my training and experience, I know that "T" and "Tina" are code words for methamphetamine and "hats" is a code word for capsules of heroin. Furthermore, the word "onion" refers to an ounce of narcotics.

17.     On this same date at approximately 2:41 p.m., two UC agents accompanied the CS to the parking lot of the Boost Mobile, located at 823 Southern Boulevard, and parked their vehicle. At approximately 2:48 p.m., surveillance units and the undercover agents observed a white Mercedes Benz bearing a Florida license tag, known to be utilized by JETER, arrive in the Boost Mobile parking lot.

18.     At this time, one of the UC agents and the CS exited the undercover vehicle and walked to the passenger side of the Mercedes Benz. Upon approaching the vehicle, JETER, who was seated in the front passenger seat, informed the CS that he (JETER) did not want to meet the UC. Based on JETER's reaction to the presence of the UC, the CS and the UC returned to the UC vehicle where the UC transferred custody of an additional $600 of DEA OAF to the CS. The CS then returned to the Mercedes Benz and entered the rear passenger seat.

19.     Once inside the Mercedes Benz, the CS gave JETER $200 of DEA OAF in exchange for 13 capsules of suspected heroin/fentanyl and $600 of DEA OAF in exchange for approximately one ounce of methamphetamine. During the transaction, JETER informed the CS that he (JETER) was not in the mood to meet the UC. JETER questioned the CS as to how the CS knew the UC and whether the UC was "legit." The CS assured JETER that the UC was "cool" and that the UC was not a drug user, but rather a distributor. The CS informed JETER that he (the CS) had previously introduced the UC to JETER's "homeboy last time" (a reference to the undercover purchase from CHIN on August 29, 2020). Once the transaction was complete, the CS exited the Mercedes Benz and returned to the UC vehicle where the CS immediately transferred

custody of the 13 capsules of suspected heroin/fentanyl as well as the sandwich baggie containing the suspected methamphetamine to the UC agents. After driving to a safe location, agents searched the CS's person for any additional contraband to include drugs and/or money. That search was negative. Audio and video of the controlled purchase was captured and placed into evidence.

20.     Following the transaction, the substances purchased from JETER on this date were submitted to the DEA Southeast Laboratory for forensic analysis. The lab confirmed that the 13 capsules of suspected heroin/fentanyl contained a mixture of fentanyl, heroin, and other narcotics, and had a net weight of 1.722 grams. The lab also confirmed that the ounce of suspected methamphetamine was, in fact, methamphetamine hydrochloride, had a purity of approximately 98% and a net weight of 27.95 grams. Thus, the amount of methamphetamine contained in this exhibit was 27.39 grams.

### September 26, 2019 CS Purchase of Heroin/Fentanyl from Marcello JETER

21.     On September 26, 2019, agents met with the CS to conduct an undercover purchase of 10 capsules of heroin/fentanyl from JETER in exchange for $150 of DEA OAF. Prior to the execution of the operation, agents searched the CS's person for any contraband to include drugs and/or money. That search was negative. On this same day, the CS exchanged text messages and placed recorded telephone calls to JETER, who utilized telephone number (561) 774-XXXX. The CS and JETER agreed to meet at the Racetrac gas station, located at 2995 45th Street, West Palm Beach, Florida, to conduct the drug transaction.

22.     On September 26, 2019 at approximately 4:06 p.m., surveillance units observed JETER arrive at the RaceTrac driving the same white Mercedes Benz bearing a Florida license tag. Just prior to his arrival, the CS received an incoming telephone call from (561) 774-XXXX,

utilized by JETER. JETER told the CS that he (JETER) was about to arrive and directed the CS to enter his (JETER's) vehicle when he arrived. The CS agreed and, moments later when JETER arrived, the CS exited the unmarked UC vehicle and entered the front passenger seat of the Mercedes Benz. Surveillance agents followed JETER's Mercedes Benz a short distance to the Courtyard by Marriott, located at 600 Northpoint Parkway, West Palm Beach, Florida, where JETER parked on the south side of the hotel. A short time later, the CS exited the Mercedes Benz and reentered the UC vehicle driven by a UC agent, which had followed the Mercedes Benz to the area. Once inside the unmarked vehicle, the CS turned over to the UC 10 capsules of suspected heroin/fentanyl, which the CS purchased from JETER in exchange for $150 of DEA OAF.

23.     The CS told agents that during the controlled purchase, JETER again questioned the CS as to the identity of the UC agent whom the CS had attempted to introduce to JETER on September 19, 2019, as noted above. The CS said that, as a result of the CS' conversation with JETER on this day, JETER was willing to meet with and sell the UC additional quantities of methamphetamine. Audio and video of the controlled purchase between the CS and JETER was captured and placed into evidence.

24.     Following the transaction, the substance purchased from JETER on this date was submitted to the DEA Southeast Laboratory for forensic analysis. The lab confirmed that the 10 capsules contained a mixture and substance that contained fentanyl, heroin, and other narcotics, and which had a net weight of 1.189 grams.

### September 30, 2019 UC Purchase of Narcotics from Marcello JETER

25.     On September 30, 2019, a UC agent initiated contact with JETER to conduct an undercover purchase of heroin/fentanyl and methamphetamine from JETER. As part of the operation, the UC agent exchanged the following text messages with JETER, utilizing telephone

number (561) 774-XXXX.

- UC: Yo, you good for today

- JETER: Yea

- UC: You got 3 onions

- JETER: (thumbs up emoji)

- UC: I'll hit you up in a lil, aight papa way

- JETER: I'm in West Palm Beach area

- UC: Where you trying meet

- JETER: Ok

- UC: Am by the outlet you sliding dis way

- JETER: Sure

- UC: K papa by the pew wei blue Nissan

- JETER: I'll send u an address shortly

- UC: K

- JETER: [redacted] Brandywine Road West Palm Beach, Florida 33409 United States

- UC: Omw

- JETER: How long

- UC: Am here by the leasing office

- JETER: Follow me in white car turning in

26.     As the UC agent communicated with JETER to arrange the location of the meeting, agents established surveillance at JETER's known residence, located at XXXX N. Haverhill Road, West Palm Beach. At approximately 3:38 p.m., surveillance agents observed JETER exit the residence, walk to a white Mercedes Benz, and enter the driver's seat.

10

Surveillance agents followed JETER to XXXX Brandywine Road, West Palm Beach, where the UC agent was waiting.

27.      Upon entering the gated residential community, the UC agent parked, exited the UC vehicle, walked to the front passenger seat of the white Mercedes Benz and entered.  Once inside, JETER gave the UC agent approximately three ounces of methamphetamine in exchange for $1,800 of DEA OAF. Additionally, JETER provided the UC agent with three capsules of heroin/fentanyl, advising they were free of charge and told the UC to give them to the CS, who had introduced the UC agent to JETER. The UC exited the Mercedes Benz, returned to the UC vehicle, and left the area. Audio and video of the controlled purchase was captured and placed into evidence.

28.      Following the transaction, the substances purchased/obtained from JETER were submitted to the DEA Southeast Laboratory for forensic analysis. The lab confirmed that the three ounces of suspected methamphetamine was, in fact, methamphetamine hydrochloride, had a purity of approximately 87% and a net weight of 86.15 grams. Thus, the amount of methamphetamine contained in this exhibit was 74.95 grams.  The lab also confirmed that the three capsules contained a mixture and substance containing fentanyl and heroin, and which had a net weight of .407 grams

### October 17, 2019 CS Purchase of Heroin/Fentanyl from David CHIN

29.      On October 17, 2019, agents met with the CS to conduct an undercover purchase of suspected heroin/fentanyl from JETER. When JETER did not respond to multiple telephone calls and a text message, the CS made contact with CHIN.

30.      At approximately 1:20 p.m., the CS placed a recorded telephone call to (561) 507-XXXX, utilized by CHIN. During the call, the CS identified himself and stated that he (the CS)

had obtained a new telephone number. The CS informed CHIN that he (the CS) had been trying to get hold of "Cello" (a nickname used by JETER) all day and that his phone was going to voicemail. CHIN stated JETER was probably sleeping. The CS asked CHIN if he (the CS) should wait for JETER to get up or if he (the CS) could meet with CHIN. CHIN responded, "It's up to you, brah." The CS told CHIN that he (the CS) was going to get ready and would let CHIN know of his (the CS's) plans.

31.     At approximately 2:50 p.m., the CS placed a recorded telephone call to (561) 507-XXXX, utilized by CHIN. The CS informed CHIN that he (the CS) was on his way and was 30 minutes away. CHIN asked the CS if the CS remembered the address where the CS had previously met him (CHIN). Not certain of the address CHIN was referring to, the CS asked for clarification. CHIN stated the location he was referring to was near Haverhill by Roebuck, where the CS pulled up on him with the "girl in the back seat." The CS acknowledged. The CS then asked CHIN if he had any "Tina," which is coded language for methamphetamine. CHIN responded, "Yeah." The CS asked CHIN if CHIN could do "four for two, that's like five a piece?" CHIN, not understanding what the CS was asking for, responded, "Four for what?" The CS stated, "Four onions for 2,000. That's like five a piece." CHIN responded by saying, "I don't even got all that right now on me." The CS then asked CHIN how much he had and if he could do "at least two?" CHIN stated, "I ain't even got all that with me over here, I ain't going to lie, I just woke up. I ain't even, I could go get it, but I didn't expect it, nobody is calling for this right now." The CS acknowledged, and told CHIN that either way he (the CS) "still needed hats" (capsules of heroin). The CS reiterated that he was 30 minutes away and the call ended.

32.     At approximately 3:28 p.m., the CS placed an unrecorded call to (561) 507-XXXX, utilized by CHIN. According to the CS, during this telephone call, CHIN informed the

CS that JETER would be turning his phone on and that he (CHIN) could go get the "Tina" (methamphetamine) that the CS had asked about earlier. The CS responded that he (the CS) told CHIN that he (the CS) no longer needed the "Tina" because he (the CS) had blown off the customer who wanted it. The CS told agents that CHIN provided him a gate code of 1968# for the community where he was to meet CHIN. This telephone call was not recorded.

33.   At approximately 3:35 p.m., the CS and JETER, who utilized (561) 774-XXXX, exchanged a series of text messages. During this exchange, JETER questioned who had sent him (JETER) a text, as he did not recognize the telephone number. The CS informed JETER who he (the CS) was, and asked JETER to lock in his (the CS's) new telephone number.

34.   At approximately 3:37 p.m., the CS received a telephone call from telephone number (561) 774-XXXX, utilized by JETER. According to the CS, during this telephone call, JETER inquired as to whether the CS still needed the methamphetamine. The CS stated he told JETER that he (the CS) blew off the individual who wanted it. This call was not recorded.

35.   Prior to sending the CS to meet with CHIN, agents conducted a search of the CS's person for any contraband to include drugs and/or money. That search was negative. At this same time, agents provided the CS with $220 of DEA OAF for the purchase of heroin/fentanyl from CHIN. A UC agent drove the CS to meet with CHIN.

36.   At approximately 3:45 p.m., while in route to meet CHIN, the CS placed a recorded telephone call to telephone number (561) 507-XXXX, utilized by CHIN. During the telephone call, the CS informed CHIN that he (the CS) was at the gate and asked if they were meeting in the same location as last time. CHIN affirmed.

37.   At approximately 3:47 p.m., a surveillance agent observed CHIN, wearing a gray shirt and blue shorts, walking down the stairs of his building. Upon CHIN reaching the

first floor landing, the surveillance agent observed CHIN walk to and enter the driver's door of a gray BMW. At about this same time, the UC agent and the CS arrived in the parking lot. After exiting the UC vehicle, the CS walked to and entered the front passenger seat of the BMW where CHIN was waiting. Once inside the vehicle, the CS gave CHIN the $220 of DEA OAF in exchange for 13 capsules containing suspected heroin/fentanyl. Less than a minute later, the CS exited the vehicle and returned to the UC vehicle. The CS immediately transferred custody of 13 capsules containing suspected heroin/fentanyl to the UC agent. The UC and the CS then left the area. Once in a safe location, agents conducted a search of the CS's person for any additional contraband to include drugs and/or money. That search was negative.

38.     The CS informed agents that once he entered CHIN's vehicle, he observed CHIN retrieve a green Publix reusable shopping bag from behind the driver's seat. The CS stated that the green bag appeared to have numerous other plastic bags in it, one of which appeared to contain 100 or more capsules of suspected heroin. The CS stated that CHIN took 13 of the capsules from the bag and gave them to the CS. In exchange, the CS gave CHIN the $220. Audio and video of the controlled purchase was captured and placed into evidence.

39.     Following the transaction outlined above, at approximately 4:49 p.m., the CS received a text message from JETER, who utilized (561) 774-XXXX. The text message read, "U need T?" (Referring to methamphetamine). The CS did not respond.

40.     Following the transaction, the substance purchased from CHIN was submitted to the DEA Southeast Laboratory for analysis. The lab confirmed that the 13 capsules contained a mixture and substance containing fentanyl and heroin, and had a net weight of 1.639 grams.

**October 23, 2019 UC Purchase of Methamphetamine from Marcello JETER**

41.     On October 23, 2019, agents conducted an undercover operation wherein a UC agent met with and purchased methamphetamine from JETER.  As part of the operation, the UC agent exchanged the following text messages with JETER, who utilized telephone number (561) 774-XXXX.

-   UC: Yo you good for today

-   JETER: Yo

-   UC: Yo if I get 4 onions you do 550 each bruh

-   JETER: Yhea

42.     During a subsequent recorded telephone call between the UC and JETER, the UC arranged to meet JETER in the parking lot of the Palm Beach Outlet Mall, located at 1751 Palm Beach Lakes Boulevard, West Palm Beach, Florida, to purchase four ounces of methamphetamine.

43.     At approximately 5:56 p.m., the UC received an incoming telephone call from (561) 774-XXXX, utilized by JETER.  During the call, JETER informed the UC that JETER had arrived at the outlet mall and the UC told JETER to meet in front of the Nike store.  At approximately 6:04 p.m., the UC placed an outgoing call to (561) 774-XXXX, which was answered by JETER.  The UC confirmed the vehicle JETER was driving and the call ended. A short time later, the UC walked out from the outlet mall stores and entered the front passenger seat of a Dodge Charger registered to JETER.  Once the UC was inside the vehicle, JETER gave the UC approximately four ounces of methamphetamine in exchange for $2,200 of DEA OAF.  After a brief conversation, the UC exited the Charger and JETER left the area. Audio and video of the controlled purchase was captured and placed into evidence.

15

44.     Following the transaction, the substance purchased from JETER was submitted to the DEA Southeast Laboratory for analysis. The lab confirmed that the substance was methamphetamine hydrochloride, which had a purity of approximately 92% and a net weight of 110.6 grams. Thus, the amount of methamphetamine contained in this exhibit was 101.75 grams.

### Additional CS Purchases of Heroin/Fentanyl from Marcello JETER

45.     Between November 8, 2019 and January 23, 2020, the CS made three additional purchases of heroin/fentanyl from JETER. Prior to and after each of the meetings with JETER, agents searched the CS's person and vehicle for drugs, money, and/or any other contraband. Those searches were negative.

46.     On November 8, 2019, the CS met with JETER and purchased 15 capsules of suspected heroin/fentanyl in exchange for $240 of DEA OAF. During the recorded meeting, JETER asked the CS, "What you need?" The CS responded, "I got 240, just hats" (referring to $240, and capsules of heroin.) After counting out the capsules, JETER stated, "Here's 15 of 'em." As their conversation continued. JETER asked the CS, "What your [UC's] name you introduced me to" (referring to the UC who met with JETER on September 30, and October 23, 2019.) The CS responded and indicated that the UC was out of town.  JETER then asked the CS if the CS "vouch(ed)" for the UC, to which the CS affirmed.  After a brief conversation about the UC during which JETER repeatedly expressed concern that the UC may be a police officer, JETER and the CS parted. Audio and video of the controlled purchase was captured and placed into evidence.

47.     Based on the above exchange between JETER and the CS, and out of a concern for the UC's safety, no further attempted undercover purchases of narcotics were made from JETER or CHIN utilizing the UC.

48.     The substance purchased from JETER on November 8, 2019 was submitted to the DEA Southeast Laboratory for analysis. The lab confirmed that the 15 capsules contained a mixture and substance containing fentanyl and heroin, which had a net weight of 2.166 grams.

49.     On December 12, 2019, at the direction of agents, the CS met with JETER and purchased 14 capsules of suspected heroin/fentanyl in exchange for $200 of DEA OAF. The substance purchased from JETER on this date was submitted to the DEA Southeast Laboratory for forensic analysis. The lab confirmed that the 14 capsules contained a mixture and substance containing fentanyl and heroin, which had a net weight of 1.891 grams. Audio and video of the controlled purchase was captured and placed into evidence.

50.     On or about January 2, 2020, the CS notified agents that he had been contacted by JETER on January 1, 2020 from a new telephone number, (561) 329-XXXX.

51.     On January 23, 2020, the CS contacted JETER at (561) 329-XXXX and made arrangements to meet with JETER to purchase additional quantities of heroin/fentanyl. On this date, the CS purchased 20 capsules of suspected heroin/fentanyl in exchange for $300 of DEA OAF. The substance purchased from JETER was submitted to the DEA Southeast Laboratory for forensic analysis.  The lab confirmed that the 20 capsules contained a mixture and substance containing fentanyl and heroin, and which had a net weight of 2.984 grams. Audio and video of the controlled purchase was captured and placed into evidence.

### June 11, 2020 Search Warrant and Arrest of David CHIN and Ryan KHAN

52.     Beginning in or about May 2020, agents from the West Palm Beach Police Department (WPBPD) initiated a narcotics investigation into Marcello JETER and his criminal associates. Through the use of a WPBPD confidential informant, agents made several purchases of heroin/fentanyl from JETER and one of JETER'S criminal associates, identified as A.S.  Based

on these buys and surveillance of JETER and his associates, WPBPD agents established probable cause to obtain state search warrants for three locations associated with JETER and his associates, most notably, XXXX Brandywine Road Apartment 7211, West Palm Beach, Florida (hereinafter "Brandywine apartment").

53.    On June 11, 2020, the WPBPD executed state search warrants at all three locations, including the Brandywine apartment. Upon making entry into the three-bedroom Brandywine apartment, officers located CHIN and Ryan Tyler KHAN inside. Both men were detained without incident.

54.    As noted below, drugs and firearms evidence seized from the Brandywine apartment were processed for latent prints and swabbed for DNA. A portion of these DNA swabs were submitted for DNA analysis and compared to the known DNA standards of Marcello JETER, CHIN, and KHAN. The results of the latent print and DNA analyses is noted next to each exhibit wherein positive results were obtained:

55.    During a search of the master bedroom area and closet on the southeast corner of the residence (labeled as **Bedroom #3** by officers), officers located and seized the following items:

a.   $24,525 in United States currency.

b.   A red/black fanny pack, which contained a Florida driver's license and a Chase bank debit card in the name of Ryan KHAN.

c.   Under the bed in the master bedroom, officers located and seized a Harrington & Richardson, Model Topper 12 gauge, single action short-barreled shotgun, S/N BA53898L, a Chase bank receipt dated 5/20/2020, which matched KHAN's name, and a Chase bank envelope addressed to KHAN.

d.  Numerous cellular telephones.

e.  A Ziploc style baggie containing a powdery substance. DEA Southeast Lab analysis revealed the substance to be a mixture of fentanyl, heroin, and other narcotics, with a net weight of 483.7 grams.

f.  A Ziploc style baggie containing a rocky/powdery substance. DEA Southeast Lab analysis revealed the substance to be a mixture of fentanyl, heroin, methamphetamine, and other narcotics, with a net weight of 391.2 grams.

g.  A Ziploc style baggie containing a rocky/powdery substance. DEA Southeast Lab analysis revealed the substance to be a mixture of fentanyl, heroin, methamphetamine, and other narcotics, with a net weight of 245.1 grams.

h.  A Ziploc style baggie containing a rocky/powdery substance. DEA Southeast Lab analysis revealed the substance to be a mixture of fentanyl, heroin, methamphetamine, and other narcotics, with a net weight of 531.1 grams.

56.    During a search of the bedroom and closet of the room labeled by officers as **Bedroom #2**, officers located and seized the following items:

a.  $35,276 in United States currency from a safe.

b.  Three sandwich style baggies that contained capsules that further contain a powdery substance. DEA Southeast Lab analysis revealed the capsules contained fentanyl, heroin, methamphetamine, and other narcotics, and had a net weight of 131.3 grams. The DNA profile obtained from the swabs used to process this exhibit indicated a mixture of at least three individuals, with at least one male contributor. JETER, CHIN, and KHAN could not be ruled out as possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the swabs is

19

approximately 26 quadrillion times more probable if the sample originated from JETER and two unknown persons, than if it originated from three unknown persons. Therefore, there is extremely strong support that JETER and two unknown persons contributed to this DNA profile, rather than three unknown persons.

c.   Two sandwich style baggies that contained a powdery substance. DEA Southeast Lab analysis revealed the powdery substance to contain a mixture of fentanyl and heroin, with a net weight of 102.2 grams. The DNA profile obtained from the swabs used to process this exhibit indicated a mixture of at least three individuals, with at least one male contributor. JETER, CHIN, and KHAN could not be ruled out as possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the swabs is approximately 6.2 quadrillion times more probable if the sample originated from JETER and two unknown persons, than if it originated from three unknown persons. Therefore, there is extremely strong support that JETER and two unknown persons contributed to this DNA profile, rather than three unknown persons.

d.   Multiple clear and blue Ziploc style baggies that contained a clear/white crystalized type substance. DEA Southeast Lab analysis revealed the substance to contain methamphetamine, which had a purity of approximately 86% and a net weight of 9.3 grams. Thus, this exhibit contained approximately 7.99 grams of methamphetamine.

e.   A Ziploc style baggie containing a rocky/powdery substance. DEA Southeast Lab analysis revealed the substance to be a mixture of heroin, fentanyl, and other narcotics, and had a net weight of 308.3 grams. The DNA profile obtained from the swabs used to process this exhibit indicated a mixture of at least three individuals

with at least one male contributor. CHIN and KHAN were excluded as contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the swabs is approximately 170 trillion times more probable if the sample originated from JETER and two unknown persons than if it originated from three unknown persons. Therefore, there is extremely strong support that JETER and two unknown persons contributed to this DNA profile, rather than three unknown persons.

f.  A Ziploc style baggie containing a rocky/powdery substance. DEA Southeast Lab analysis revealed the substance to be a mixture of fentanyl, methamphetamine, and other narcotics, with a net weight of 104.37 grams. The DNA profile obtained from the swabs used to process this exhibit indicates a mixture of at least two individuals with at least one male contributor. KHAN was excluded as a contributor to this mixed DNA profile; however, JETER and CHIN could not be ruled out as contributors. The analysis noted that the DNA profile obtained from the swabs is approximately 1.1 quadrillion times more probable if the sample originated from JETER and an unknown person than if it originated from two unknown persons. Therefore, there is extremely strong support that JETER and an unknown person contributed to this DNA profile, rather than two unknown persons.

g.  A Ziploc style baggie that contains a clear/white crystalized type substance. DEA Southeast Lab analysis revealed the substance to contain methamphetamine, which had a purity of approximately 82% and a net weight of 23.36 grams.

h.  Two sandwich style baggies that contain capsules that further contain a powdery substance. DEA Southeast Lab analysis revealed the capsules to contain a mixture of fentanyl, heroin, and other narcotics, and had a net weight of 12.689 grams. Two

latent prints suitable for comparison were developed on one of the clear plastic bags. These latent prints were identified as belonging to A.S.

i.  A sandwich style baggie that contains a clear/white crystalized type substance. DEA Southeast Lab analysis revealed the substance to contain methamphetamine, which had a purity of approximately 94% and a net weight of 2.54 grams.  Thus, this exhibit contained approximately 2.38 grams of methamphetamine.

j.  Mossberg, Model 500ct, 20 gauge pump action shotgun, S/N G67892. Swabs used to process the stock and pump handle of the Mossberg 20 gauge shotgun were combined into a single sample for DNA analysis. The DNA profile obtained from this sample indicates a mixture of at least four individuals, with at least one male contributor. JETER, CHIN, and KHAN could not be ruled out as possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the sample is approximately 20 billion times more probable if the sample originated from JETER and three unknown persons, than if it originated from four unknown persons. Therefore, there is extremely strong support that JETER and three unknown person contributed to this DNA profile, rather than four unknown persons.

k.  Mossberg, Model 500, 12 gauge pump action shotgun, S/N T942966.

l.  Akkar Silah Sanayitic Charles Daly, Model Field Hunter 12 gauge pump action Shotgun, S/N 3122059. Swabs used to process the grip, pump handle, and handle of the Charles Daly shotgun were combined into a single sample for DNA analysis. The DNA profile obtained from this sample indicates a mixture of at least four individuals with at least one male contributor. JETER, CHIN, and KHAN could not be ruled out as possible contributors to this mixed DNA profile. The analysis noted that the DNA

22

profile obtained from the sample is approximately 49 billion times more probable if the sample originated from <u>JETER</u> and three unknown persons, than if it originated from four unknown persons. Therefore, there is extremely strong support that JETER and three unknown person contributed to this DNA profile, rather than four unknown persons.

m. MMC Armory, 5.56 Cal, semi-auto rifle, S/N A02454.

n. Vulcan, model V94, 9mm semi-auto rifle, S/N H005556.

o. Glock, 23 Gen 4, 40 Cal semi-auto pistol. S/N BHLH157.

p. Taurus, model PT-25, 25 auto semi-auto pistol.

q. Taurus model The Judge, 45 Cal /.410 Revolver, S/N GN749339.

r. Multiple boxes of ammunition, magazines.

57. During a search of the bedroom and closet of the room labeled by officers as **Bedroom #1**, officers located CHIN's Florida driver's license and two handguns in a dresser drawer, as well as additional items all of which is described below.

a. $2,478 in United States currency.

b. FNH, 5.7 x 28 semi-auto pistol S/N 386323683 (WPBPD Ex. 202136 / 202150). Swabs used to process the grip and slide of the FNH pistol were combined into a single sample for DNA analysis. The DNA profile obtained from this sample indicates a mixture of at least three individuals, with at least one male contributor. KHAN was excluded as a contributor to this mixed DNA profile. JETER and CHIN could not be ruled out as possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the sample is approximately 2.3 trillion times more probable if the sample originated from <u>JETER</u> and two unknown

persons than if it originated from three unknown persons. Therefore, there is extremely strong support that JETER and two unknown person contributed to this DNA profile, rather than three unknown persons. Furthermore, the analysis also noted the DNA profile obtained from the sample is approximately 140 trillion times more probable if the sample originated from CHIN and two unknown persons than if it originated from three unknown persons. Therefore, there is extremely strong support that CHIN and two unknown person contributed to this DNA profile, rather than three unknown persons.

c. Glock 20, 10mm semi-auto pistol S/N WX501 US. Swabs used to process the grip and slide of the Glock pistol were combined into a single sample for DNA analysis. The DNA profile obtained from this sample indicates a mixture of at least four individuals with at least one male contributor. JETER, CHIN, and KHAN could not be ruled out as possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the sample is approximately 8.2 quadrillion times more probable if the sample originated from CHIN and three unknown persons than if it originated from four unknown persons. Therefore, there is extremely strong support that CHIN and three unknown persons contributed to this DNA profile, rather than four unknown persons.

d. One .40 caliber extended magazine and one .40 caliber drum magazine.

e. Cellular telephones.

58.    During a search of the **kitchen** area of the apartment, officers found the following items:

a.  Various baggies containing a greenish powdery substance and various capsules containing a similar substance. DEA Southeast Lab analysis revealed the greenish powdery substance to be a mixture of fentanyl, heroin, methamphetamine, and other narcotics, and had a net weight of 223 grams. DEA Southeast Lab analysis revealed the capsules to contain a mixture of fentanyl, heroin, methamphetamine, and other narcotics, and had a net weight of 7.721 grams. Swabs used to process the packaging of this exhibit were submitted for DNA analysis. The DNA profile obtained from the swabs indicates a mixture of at least three individuals, with at least one male contributor. JETER and CHIN were excluded as contributors to this mixed DNA profile; however, KHAN could not be ruled out as a possible contributor to this mixed DNA profile. The analysis noted that the DNA profile obtained from the swabs is approximately 7.1 quadrillion times more probable if the sample originated from KHAN and two unknown persons than if it originated from three unknown persons. Therefore, there is extremely strong support that KHAN and two unknown person contributed to this DNA profile, rather than three unknown persons.

b.  A large Ziploc style baggie that contained various other baggies that further contained a powdery substance. From this exhibit, the DEA Southeast Lab separated the exhibit into seven sub-exhibits for analysis. Of the seven sub-exhibits, Ex. 28.2 contained a mixture of fentanyl, heroin, methamphetamine, and other narcotics, and had a net weight of 98.6 grams; Ex. 28.3 contained a mixture of fentanyl, heroin, and other narcotics, and had a net weight of 36.6 grams; Ex. 28.5 contained a fentanyl, heroin, methamphetamine, and other narcotics, and had a net

weight of 109.2 grams; and Ex. 28.6 contained a mixture of fentanyl, heroin, methamphetamine, and other narcotics, and had a net weight of 99.2 grams. Swabs used to process the packaging of this main exhibit were submitted for DNA analysis. The DNA profile obtained from the swabs indicates a mixture of at least three individuals with at least one male contributor. JETER, CHIN, and KHAN could not be ruled out as a possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the swabs is approximately 42 quadrillion times more probable if the sample originated from <u>KHAN</u> and two unknown persons than if it originated from three unknown persons. Therefore, there is extremely strong support that KHAN and two unknown person contributed to this DNA profile, rather than three unknown persons.

c.  Multiple Ziploc style baggies further containing a powdery substance. DEA Southeast Lab analysis revealed the powdery substance to be a mixture of fentanyl and other narcotics, and had a net weight of 295.8 grams. Swabs used to process the packaging of this exhibit were submitted for DNA analysis. The DNA profile obtained from the swabs indicates a mixture of at least two individuals with at least one male contributor. This DNA profile was interpreted as three contributors. JETER, CHIN, and KHAN could not be ruled out as a possible contributors to this mixed DNA profile. The analysis noted that the DNA profile obtained from the swabs is approximately 1.9 quadrillion times more probable if the sample originated from <u>KHAN</u> and two unknown persons than if it originated from three unknown persons. Therefore, there is extremely strong support that KHAN and two unknown person contributed to this DNA profile, rather than three unknown persons.

26

d. A Ziploc style baggie that contained a clear/white crystalized type substance. DEA Southeast Lab analysis revealed the substance to contain methamphetamine, which had a purity of approximately 86% and a net weight of 70.6 grams. Thus, this exhibit contained approximately 60.71 grams of methamphetamine.

59.       Based on the items seized during the execution of the search warrant, CHIN and KHAN were arrested on state drugs and weapons charges.

**Seizure of 4 Kilograms of Narcotics and the Arrest of Antony Junior HARRIS**

60.       On July 28, 2020, Antony Junior HARRIS was arrested after agents located and seized two kilograms of fentanyl and two kilograms of methamphetamine inside a parcel that destined to be received by HARRIS. Agents exchanged the fentanyl and methamphetamine for "sham" narcotics and subsequently conducted a controlled delivery of the parcel. Agents watched as HARRIS retrieved the parcel from A.B., the initial recipient of the parcel. Agents followed HARRIS back to his apartment and received a ping indicating that the parcel had been opened. HARRIS slipped out of his apartment, subsequently led officers on a half mile foot chase, and was ultimately arrested. During the course of that investigation, agents obtained a state search warrant for HARRIS's apartment. During a search of the apartment, agents located the four kilograms of "sham" narcotics in the master bedroom on the nightstand next to the bed. Agents observed the original packaging for the parcel, and the interior packaging in which the counterfeit narcotics were contained, on the kitchen island. The shipping label, which had been on the parcel, was located in the kitchen garbage can and was torn apart. Additionally, law enforcement located inside the residence approximately 62 grams of suspected marijuana, miscellaneous drug paraphernalia to include scales containing suspected cocaine residue, as well as various pieces of jewelry with a combined appraised retail value of $121,500, cellular telephones, and Western

27

Union money orders with a total value of $8,100. Law enforcement also located a suspected drug ledger that included various names and suspected dollar amounts. On this ledger, agents saw the name/nickname "Cello" and the amount of "27000." As outlined below, agents believe this notation of "Cello" was a reference to Marcello JETER owing HARRIS $27,000 for narcotics.

61.     The suspected narcotics seized from the parcel were submitted to the Southeast Laboratory for analysis. The lab analysis revealed the four clear vacuum-sealed packages of suspected methamphetamine was, in fact a mixture containing methamphetamine hydrochloride, had a purity of approximately 83% and a net weight of 2,219.3 grams. DEA Southeast Lab analysis revealed the other two separately wrapped packages was a mixture of Fentanyl and Xylazine, and had a net weight of 2,033.5 grams.

62.     HARRIS was initially arrested on state drug trafficking charges, but was later charged in 20-8280-DLB with federal narcotics charges.

**Proffered Statement of a Cooperating Defendant**

63.     In or around October 2020, <u>one</u> of the five individuals referenced herein (HARRIS, JETER, KHAN, CHIN, or A.S.) agreed to cooperate with law enforcement and provided an immunized statement concerning his own involvement, and the involvement of the four others outlined herein. <u>For his safety, this individual will be referred to as either cooperating defendant (CD), or by his actual name (HARRIS, JETER, KHAN, CHIN, or A.S.).</u> The information outlined below is only a portion of the statements made by the CD and is not intended to be a verbatim or all-inclusive account of the CD's statements.

64.     During the interview, agents showed the CD various photographs in order to positively identify the individuals to whom the CD was referring and/or to see if the CD knew a specific individual. Prior to doing so, agents informed the CD that he (the CD) may or may not

28

recognize the individuals in the photographs. Agents further instructed the CD to look at the facial features that do not change over time, such as the eyes, nose, mouth, etc., with the understanding that someone can change their appearance by cutting or allowing their hair and/or facial hair to grow long. The CD indicated that he understood.

65.     Agents asked the CD about the June 11, 2020 search warrant of the Brandywine apartment. The CD stated the apartment was utilized by Marcello JETER, Ryan KHAN, David CHIN, and A.S. The CD stated that the expenses for the apartment of $1,400 to $1,600 per month and was shared by the four men.

66.     The CD explained which bedrooms were primarily occupied by which defendants.

67.     The CD identified Bedroom #3 as primarily belonging to A.S., but that KHAN also used the room when he brought girls to the apartment. This is the same room where officers located KHAN's Florida driver's license. The CD stated that A.S. would stay at the apartment, or at his (A.S.'s) mother's apartment on Australian Avenue. The CD stated that the short-barreled shotgun found under the bed belonged to A.S.

68.     The CD identified Bedroom #2 as belonging to JETER. This is the same room where JETER's DNA was found on drug packaging and firearms. The CD stated that JETER stayed at the apartment three to four times a week. The CD stated that JETER stored drugs and guns in the room, and that JETER shared the drugs and guns with CHIN. The CD stated that in addition to the drugs and guns, JETER also stored a safe in the room. Agents showed the CD a photograph of a red bag containing numerous capsules of suspected fentanyl and clear baggies containing additional quantities of suspected fentanyl. The CD identified this bag as belonging to JETER. The CD also stated that JETER carried firearms during his drug trafficking activities.

69.     The CD identified Bedroom #1 as belonging to CHIN.  This is the same room in which officers located CHIN's Florida driver's license and two handguns. Agents showed the CD a photograph of the two handguns (a Glock 20 10mm semi-auto pistol and a FNH 5.7 x 28 semi-auto pistol) in a drawer that also included CHIN's Florida drivers' license. The CD identified both firearms as belonging to CHIN and stated CHIN normally carried one or both of the firearms on a daily basis while he conducted his drug trafficking activities.

70.     The CD stated that all of them (JETER, CHIN, KHAN and A.S.), were involved in the distribution of drugs to their own customers. The CD stated that, in addition to having their own customers, CHIN, KHAN, and A.S. also sold drugs to JETER's customers when JETER was out of town or unavailable. The CD stated that CHIN, KHAN, and A.S. had each previously "worked" JETER's phone(s) for the purpose of distributing drugs to JETER's customers.

71.     The CD stated one of JETER's primary sources of supply for the various drugs JETER and the others distributed was an individual whom the CD knew by the nicknames of "D-Bo," "Bo," and "Unc." The CD described "D-Bo" as a black male, 38 to 42 years of age, with light skin, and long dreads. The CD stated that "D-Bo" had an apartment at the Arium apartment complex located at Boynton Beach Boulevard and Jog Road, as well as a condominium near Federal Highway and Gateway Boulevard. The CD said that "D-Bo" drove a number of different vehicles, to include a white Chrysler 300, a black/white Range Rover, a white Porsche Panamera, and a red Mercedes Benz G Wagon.

72.     Following the CD's description of "D-Bo," agents presented the CD with a photograph of Antony HARRIS and asked the CD if he recognized the individual in the photograph. The CD immediately identified HARRIS as the individual he knew as "D-Bo."

30

73.     The CD stated that JETER and KHAN met HARRIS approximately three years earlier when HARRIS was living in a condominium, possibly off of Ives Dairy Road in Sunny Isles, Florida. The CD recalled HARRIS' condo possibly being on the 18th or 19th floor, where JETER and KHAN met with HARRIS. More recently, the CD stated that JETER and KHAN primarily met HARRIS at the Arium apartment in Boynton Beach, or at a gas station near HARRIS' condominium in the area of Federal Highway and Gateway Boulevard, Boynton Beach.

74.     The CD stated that HARRIS had six to seven different sources of supply for the drugs, who were located in Texas and California, and who shipped HARRIS black-tar heroin, cocaine, methamphetamine, and fentanyl. The CD stated that JETER and KHAN were the only two of the four (not CHIN or A.S.) who HARRIS met with to conduct the drug transactions.

75.     During their first deal with HARRIS, which occurred approximately 3 years earlier, the CD stated that HARRIS fronted JETER two ounces of black tar heroin. The CD stated that while KHAN was present for the deal, KHAN was not involved in the distribution of drugs at that time. The CD stated that KHAN got involved approximately a year later after seeing how much money JETER was making. The CD stated that HARRIS liked JETER and KHAN based on their involvement in the music industry.

76.     The CD stated that after the initial two ounces of black tar heroin, the quantity of black tar heroin JETER obtained from HARRIS increased to a quarter kilogram approximately once a month, and then to a half kilogram once a month. The CD estimated that JETER purchased a total of five to six kilograms of black tar heroin from HARRIS during their first year of working together. The CD stated that CHIN was also involved with the black tar heroin, but was more involved later as they (HARRIS, JETER, and KHAN) transitioned into distributing cocaine.

77.     After approximately the first year, the CD stated that JETER and HARRIS switched to powder cocaine. The CD stated that HARRIS was not happy with the return he (HARRIS) was getting from the black tar heroin and thought that he (HARRIS) would make more money selling cocaine. The CD stated that JETER then sold both powder and crack cocaine, as JETER knew how to cook the powder cocaine into crack cocaine.

78.     The CD stated that when HARRIS first began supplying the cocaine to JETER, HARRIS gave or fronted JETER a quarter kilogram of cocaine three to four times during the period of a week or two. The CD stated that the quantity of cocaine HARRIS supplied JETER increased to a kilogram per month. The CD stated it was at that same time that KHAN became involved in the distribution of cocaine. The CD stated that KHAN distributed four to five ounces from each kilogram of cocaine that JETER received.  The CD stated that after approximately six months of taking the four to five ounces per month, KHAN increased the quantity he (KHAN) distributed to 14 to 15 ounces every month to two months. The CD said that JETER was making $50 off each ounce KHAN took and distributed. The CD estimated that during the approximate 18 months JETER obtained cocaine from HARRIS, JETER purchased a total of approximately 10 to 12 kilograms of cocaine from HARRIS.

79.     The CD stated that at some point in time, HARRIS decided to switch to methamphetamine because HARRIS thought his cocaine sources of supply were charging him too much. The CD stated that JETER initially began with one pound of methamphetamine. The CD stated that over the next few months, JETER was able to build up his methamphetamine clientele and therefore the quantity of methamphetamine JETER obtained from HARRIS increased to approximately three pounds approximately every three weeks. The CD stated that the quantities JETER received continued to grow over time to eight to ten pounds every two weeks, or 16 to 20

pounds per month. The CD stated these quantities continued through the time of CHIN's and KHAN's arrests in June 2020.

80.    The CD stated that at or near the time that JETER and HARRIS transitioned to methamphetamine, KHAN took a year off from selling the narcotics supplied by HARRIS, and instead, sold THC cartridges. The CD stated that there were times, however, during that one year period, wherein KHAN worked JETER's phone and delivered drugs to JETER's customers.

81.    The CD stated that in approximately June 2018, KHAN became involved in the distribution of methamphetamine that was supplied to KHAN by HARRIS, or by HARRIS through JETER.  The CD stated that of the eight to ten pounds of methamphetamine JETER received at a time, KHAN distributed two to three pounds.

82.    The CD stated that JETER distributed methamphetamine for approximately the last two years. During that time, the CD estimated that JETER received approximately 120 to 150 kilograms of methamphetamine from HARRIS. The CD stated that JETER paid HARRIS $2,750 to $3,200 per pound for the methamphetamine. The CD stated that JETER normally met with HARRIS to receive the methamphetamine and later to make payment to HARRIS.

83.    The CD stated that a few months before HARRIS got off probation (September 2019), HARRIS also began supplying JETER and KHAN with fentanyl. The CD stated that while HARRIS was on probation, and possibly thereafter, HARRIS flew to California using an alias name.

84.    The CD stated that initially, JETER and KHAN received three to four ounces of fentanyl per week from HARRIS.  The CD said that, over time, the quantity of fentanyl HARRIS supplied JETER increased. The CD stated that JETER and KHAN received, on average, one

33

kilogram of fentanyl per month from HARRIS. The CD estimated that JETER and KHAN received a total of approximately 13 to 15 kilograms of fentanyl from HARRIS.

85.    The CD stated that CHIN distributed, on average, approximately five to nine ounces of fentanyl per month, but also knew of CHIN distributing up to 18 ounces in one month. The CD stated that JETER charged CHIN $2,000 per ounce of fentanyl.  The CD stated when KHAN was actively involved in the distribution of the fentanyl, KHAN distributed six to nine ounces per month. The CD stated that A.S. distributed five to nine ounces of fentanyl per month.

86.    In addition to the fentanyl, the CD stated that CHIN also distributed, on average, 10 to 11 ounces of methamphetamine per month. The CD said that JETER dropped the price he (JETER) charged CHIN to $375 per ounce after JETER was released from jail in September 2019. The CD stated while JETER was in custody, CHIN learned how much JETER was actually paying for the meth.

87.    The CD said that during the fentanyl time period, HARRIS also supplied JETER with nine ounces of black tar heroin every two to three months.  The CD stated that JETER used the black tar heroin as a cutting agent and that he would mix it in with the fentanyl. The CD stated that JETER would put the black tar heroin in the freezer, and then later mix an ounce of the heroin with two ounces of a different cutting agent, such as quinine or mannitol, that would turn the black tar heroin into a brown powder.

88.    The CD stated that following JETER's arrest in August 2019, CHIN and KHAN moved JETER's drugs, blenders, and other paraphernalia.  The CD stated that some of the items were moved to an apartment and then to a vacant property owned by JETER's mother. The CD stated that CHIN maintained custody of the bags with the drugs which the CD estimated contained approximately four pounds of methamphetamine and five ounces of fentanyl. The CD

34

stated CHIN worked JETER's phone(s), delivering to JETER'S drug customers while JETER was incarcerated.

89.     Based on the information outlined above, including the CD's statement, the undercover buys from JETER and CHIN, and the narcotics seized from the Brandywine apartment, your affiant believes the following:

a.  JETER is responsible for distributing 3,202 grams of a mixture and substance containing a detectable amount of fentanyl, and 358.18 grams of methamphetamine. Based on extrapolation of the amounts of narcotics stated by the CD, JETER is responsible for distributing approximately five (5) kilograms of black tar heroin, approximately ten (10) kilograms of cocaine, approximately 120 kilograms of methamphetamine, and approximately 13 kilograms of fentanyl.

b.  HARRIS is responsible for distributing approximately five (5) kilograms of black tar heroin, approximately ten (10) kilograms of cocaine, approximately 120 kilograms of methamphetamine, and approximately 13 kilograms of fentanyl.

c.  CHIN is responsible for distributing 1,541 grams of a mixture and substance containing a detectable amount of fentanyl, and 85.71 grams of methamphetamine. Based on the extrapolation of the amounts of narcotics stated by the CD, CHIN is responsible for distributing approximately 240 ounces (10 ounces per month for 24 months) of methamphetamine, and approximately 60 ounces (5 ounces per month for 12 months) of fentanyl.

d.  KHAN is responsible for distributing 2,530 grams of a mixture and substance containing a detectable amount of fentanyl, and 70.6 grams of methamphetamine. Additionally, based on the lower end of the estimates provided by the CD as to the drug

quantities KHAN was distributing on a monthly basis, KHAN is also responsible for approximately four pounds of methamphetamine, and approximately 54 ounces (six ounces a month for nine months) of fentanyl.

### Corroborative Evidence of HARRIS and JETER's Communications

90.    As noted above, during the execution of the search warrant at HARRIS's apartment in July 2020, law enforcement located and seized multiple cellular telephones. Agents sought and obtained a search warrant that authorized the search of the four cellular telephones seized from HARRIS's apartment.

91.    Agents located text message communications and/or contacts between the HARRIS telephones and telephone numbers known to have been used by JETER. In two of the three HARRIS telephones (HARRIS Telephones #1 and #3), the telephone numbers known to have been used by JETER were stored in the phones under the name "Cello," which is a nickname used by Marcello JETER.

92.    One of HARRIS's telephones, identified as Alcatel 5041C (referred to as HARRIS Telephone #1), appeared to have been activated on or about October 22, 2019 based on stored text message activity, with its last text message communication occurring on or about December 21, 2019. In reviewing the stored data on HARRIS Telephone #1, your affiant found numerous screenshots of packages being tracked from California to Florida, as well as text message conversations related to the shipments and suspected drug trafficking. This information is consistent with the information provided by the CD, as outlined above, and the facts surrounding HARRIS's arrest in July 2020.

93.    Further analysis of HARRIS Telephone #1 revealed HARRIS had communications with a known JETER telephone number, (561) 774-XXXX (JETER Telephone #1), as early as

36

November 9, 2019. This is the same telephone number that used by JETER to conduct the sales of heroin/fentanyl and methamphetamine with the CS and UC during the months of September 2019 through December 2019.

94.     The following text message communications between HARRIS Telephone #1 and JETER Telephone #1 occurred on December 7, 2019:

HARRIS: Going get a whole how long y'all think to get rid of whole

JETER:   Less than 3 weeks

HARRIS: Ok

Based on your affiant's knowledge of this investigation, the information provided by the CD, the timing of these messages, and the amount of time JETER responded he would need, your affiant believes HARRIS was referring to a kilogram of fentanyl when he asked JETER how long it would take him to get "rid of whole."

95.     The following text message communications between HARRIS Telephone #1 and JETER Telephone #1 occurred on December 12, 2019:

HARRIS: When y'all get anything I have to bk I'm going nut

HARRIS: My thing is how all of them say the same thing all different places bro do the math 3 whole 17 at 38 a piece over a hundred I'm dying my gee

JETER: I feel u, I'm tryna get to it

JETER: I heard ups is the worst one tho

HARRIS: Trust yeah I should of went fedx

JETER: My dog used to fw post office. Shit always sweet

HARRIS: Ok

Based on your affiant's knowledge of this investigation, the information provided by the CD, and the other data and communications located within HARRIS Telephone #1, your affiant believes HARRIS was referring to shipments of drugs that he was waiting to receive via "ups" (United Parcel Service). Your affiant further believes that HARRIS was concerned the delivery of the packages was delayed as "all of them say the same thing" (via UPS tracking data) even though the packages were going to "different places." Your affiant believes that HARRIS was concerned about taking a loss if the packages did not arrive, as he stated "3 whole" (kilograms of fentanyl) at "38 a piece" ($38,000), at a total price of "over a hundred" ($100,000). Your affiant believes JETER commented that his "dog" (associate) had previously used the "post office" (U.S. Post Office) to ship narcotics without issue.

96.     The following text message communications between HARRIS Telephone #1 and JETER Telephone #1 occurred on December 16, 2019:

JETER: Aye u got any clear kush laying around ? One of my dogs tryna cash out

HARRIS: Naw I gave y'all everything

JETER: Aight it straight, I just got shake left, buddy want some big nugs. Fuck em.

Based on your affiant's training and experience, your affiant's knowledge of this investigation and the undercover buys outlined above, as well as the information provided by the CD, your affiant believes that JETER referred to methamphetamine when he asked HARRIS if HARRIS had "any clear kush laying around." Your affiant further believes that JETER's use of the words "big nug" referenced larger pieces or nuggets of the methamphetamine as opposed to small, crushed pieces. Based on HARRIS's response, your affiant believes HARRIS did not have any additional quantities because HARRIS had given JETER and JETER's associates all that HARRIS had at that time.

97.     The second HARRIS telephone, identified as LG X220 K5 (referred to as HARRIS Telephone #2), appears to have been activated on or about January 23, 2020 based on stored text message activity, with its last text message communication occurring on or about February 22, 2020. In reviewing the stored data on HARRIS Telephone #2, your affiant found photographs of shipment tracking receipts, as well as text message conversations and call log data. As previously noted, this information is consistent with the information provided by the CD outlined above and the facts surrounding HARRIS's arrest in July 2020.

98.     Further analysis of HARRIS Telephone #2 revealed HARRIS had communications with a known JETER telephone, that being (561) 329-XXXX (JETER Telephone #2), as early as February 6, 2020, when HARRIS texted JETER, "Yo deeboe new number." As previously noted, "D-Bo" or "Deeboe" is a known nickname for HARRIS. It should also be noted that JETER Telephone # 2 is the same telephone number that was used by JETER to conduct the sale of heroin/fentanyl to the CS in January 2020.

99.     The third HARRIS telephone, identified as Alcatel A501DL (referred to as HARRIS Telephone #3), appears to have been activated on or about February 23, 2020, based on stored text message activity, and its last text message communication was on or about April 25, 2020. In reviewing the stored data on HARRIS Telephone #3, your affiant found photographs of shipment tracking receipts, as well as other photographs of drug related material. An example of the photographs were several screen shots of an online news article titled, "Coronavirus has almost completely shut down the China-Mexico drug pipeline." The article, in part, reads, "The raw chemical ingredients used for manufacturing methamphetamine and fentanyl are mainly sourced from China, the epicenter of the outbreak." The article went on to discuss the increased cost of the drugs due to the scarcity of the chemicals used to produce the drugs.

100.    Further analysis of HARRIS Telephone #3 revealed HARRIS had communications with a known JETER telephone, that being (561) 985-XXXX (JETER Telephone #3), as early as February 28, 2020. JETER Telephone # 3 was the same telephone number that was used by JETER to conduct the sale of heroin/fentanyl to the WPBPD CS in May 2020.

101.    Based on the foregoing, your affiant respectfully submits that there is probable cause to charge Marcello JETER, Ryan KHAN, and David CHIN with: conspiracy to possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, and 50 grams or more of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

FURTHER YOUR AFFIANT SAITH NAUGHT.

_____
DAVID WEEKS
SPECIAL AGENT
U.S. DRUG ENFORCEMENT ADMINISTRATION

SWORN AND ATTESTED TO ME BY APPLICANT BY TELEPHONE (FACETIME) PURSUANT TO FED. R. CRIM. P. 4(d) AND 4.1 THIS 4 DAY OF JANUARY 2021 IN WEST PALM BEACH, FLORIDA.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  21-8001-BER

UNITED STATES OF AMERICA

v.

Marcelo Marquise Jeter, David Andrew
Romario Chin, and Ryan Tyler Khan

Defendants.
_____/

CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States
   Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?      ___ Yes ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States
   Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   ___ Yes ✓ No

3. Did this matter originate from a matter pending in the Central Region of the United States
   Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?    ___ Yes ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:  *Rinku Tribuiani*

RINKU TRIBUIANI
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.    0150990
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:     (561) 820-8711
Fax:     (561) 820-8777
Email:   RTribuiani@usa.doj.gov